UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 08 CR 688 |
| | ) | |
| JOSEPH BANKS | ) | Judge Rebecca R. Pallmeyer |
| a/k/a "Jose Banks," | ) | |
| | ) | |
| Defendant | ) | |

## ORDER

Defendant Joseph a/k/a Jose Banks has been charged with five counts of bank robbery. Five eyewitnesses have identified Mr. Banks as the perpetrator of the robberies charged in Counts Three, Four and Five. Defendant proposes to call Solomon Fulero, an expert on memory and cognition, to offer expert testimony concerning the reliability of eyewitness identification. The government has moved to exclude that testimony on the ground that some of Dr. Fulero's opinions are substantively flawed, some do not fit the facts of this case, and others are obvious matters within the "ken" of the ordinary juror. The court has scheduled a *Daubert* hearing for resolution of this motion. Even before that hearing, however, the court is prepared to rule on some of the issues raised. As explained below, the government's motion is granted in part, denied in part, and continued in part. In this order, the court identifies portions of Dr. Fulero's testimony that it expects to admit, other portions that will be excluded, and still other portions as to which the court will rule only after hearing Dr. Fulero's testimony (and that of the government's proposed witness, John C. Yuille) outside the presence of the jury.

### *Daubert* / Rule 702 Standards

As the Supreme Court explained in *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S. Ct. 2786 (1993), the district judge is the gatekeeper regarding the admission of expert testimony. Federal Rule of Evidence 702 and the controlling case law permits the court to admit the testimony

of a person who has "knowledge, skill, experience, training, or education" necessary to assist the trier of fact in "understand[ing] the evidence or determin[ing] a fact in issue."  FED. R. EVID. 702. Expert testimony is admissible only where it is based on sufficient facts or data and is the product of proper application of reliable principles and methods.  *Daubert,* 509 U.S. 579; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167 (1999).

Dr. Fulero has a Master's and Ph.D. degrees in psychology from the University of Oregon, and earned a J.D. from that institution as well.  (Fulero Vita, Exhibit A to Defendant's Response [132].  Dr. Fulero has been active in numerous professional organizations, has extensive clinical and academic experience, is widely published, and is well-recognized for his work examining the reliability of eyewitness testimony.  He has testified in dozens of cases as an expert in state and federal courts throughout the nation.  (Fulero list of cases, Exhibit B to Defendant's Response.)  Although the government challenges the propriety of Dr. Fulero's testimony in this case, it has not challenged his expertise generally.

**Fulero's Proposed Testimony**

As a preliminary matter, the court cautions that no expert will be permitted to offer opinions concerning the credibility of any of the individual witnesses.  Nor will Mr. Fulero be permitted to comment on the motives of Detective Ciccola.  The court understands that Mr. Fulero will offer opinions instead about the memory process that might affect an eyewitness's account.  As Fulero explains in his expert report, the memory process is generally understood as having three stages: acquisition, retention, and retrieval.  Mr. Fulero contends that "[f]actors present at each stage . . . can affect the accuracy of eyewitnesses," and he proposes to offer opinions about each stage, described below.

**I.   Stages of Memory**

    **A.   Acquisition stage:**

        **1.   Exposure time (longer, more accurate; but also time overestimation)**

Mr. Fulero will testify that the longer a person is exposed to an observation, the more accurately he or she will recall it. The government objects to this testimony as little more than common sense, and the court generally agrees that jurors do not require the testimony of an expert to understand that a longer exposure can enhance the accuracy of an eyewitness's testimony.

Fulero also proposes to testify that eyewitnesses may overestimate the length of time in which they saw the perpetrator of the offense. The court will reserve ruling on the admissibility of this opinion, but suspects it is unlikely to be of assistance to the jury. Again, common sense suggests that jurors understand the risk that eyewitnesses will not remember exactly how much time they were exposed to a certain event and that overestimation is a possibility. Unless there is evidence that the eyewitnesses in fact did overestimate the length of their observations, Mr. Fulero's testimony on this score may be an inappropriate attack on the credibility of those eyewitnesses. Notably, according to the government, there is at least some video surveillance evidence that will corroborate the eyewitnesses' time estimates.

The court sustains the government's objection to the "exposure time" opinion in part and enters and continues it in part.

        **2.   Detail salience (unusual details grab attention but detract overall)**

Mr. Fulero proposes to testify that unusual details–a mask or fake beard of the type worn by the perpetrator in this case, for example–can grab the attention of an eyewitness but detract from his/her overall accuracy. Fulero notes, for example, that masks obscure the facial-feature cues necessary for recognition. The court agrees with the government that this phenomenon is a matter within the common sense of jurors and can be brought out by the simple expedient of cross-examining the eyewitnesses. The government's objection is sustained.

### 3. Stress (high stress conditions cause more mistakes [not fewer, as is commonly assumed] and time overestimation)

Dr. Fulero intends to testify that when a witness is under high stress conditions, the accuracy of his/her memory suffers. The expert retained by the government, John C. Yuille, challenges this assertion. He emphasizes that it is based on laboratory studies, and suggests that in the real world context, stress can enhance a witness's memory for details. (Yuille opinion, Exhibit B to Government's Motion [119], at 5.) The court believes that the effect of stress on the accuracy of memory is a matter that may not be obvious to lay jurors. As the experts themselves disagree, and both experts offer research support for their views, the government's objection to this aspect of Dr. Fulero's testimony is overruled.

### 4. Weapons focus (attention time spent focused on weapons; less time to focus on other stimuli)

Jurors do not need an expert to tell them that when a witness is focused on a dangerous weapon, time attending to the weapon will be at the expense of the witness's attention to other stimuli. This could easily–and more effectively–be presented through cross-examination of the eyewitnesses with questions like, "You saw a gun, correct?" "The gun was pointed at you?" "Did that scare you?" "It was a small gun, correct?" This is a matter within the ken of the ordinary juror, and the government's objection to expert testimony on the issue is sustained.

### 5. Cross-racial identification

Mr. Fulero will testify that research subjects show poorer accuracy when identifying persons of a race other than their own. The court is familiar with this contention, but it is not evident that all jurors will understand the risks involved in cross-racial identifications. The government itself asserts that only 66% of respondents in one survey acknowledged that cross-racial identifications may be less accurate. (Government Motion at 11.) The government apparently believes that this finding militates against admission of this testimony, but the court believes defendant is entitled to offer evidence that will explain a principle unfamiliar to one of every three jurors. The court overrules the

government's objection.

### 6. Obvious factors (lighting, eyesight, age, etc.)

Fulero identifies certain factors, such as the available light and the eyesight and age of the eye, as obvious relevant considerations. The court agrees that these factors are indeed obvious and sustains the government's objection to this testimony.

### B. Retention stage:

#### 1. Length of interval (longer, less accurate; early and complete recording of eyewitness evidence at time of event is crucial)

Memory fades with time, and the time that passes between the incident and the identification is a factor in the accuracy of the identification. The court agrees with the government that this, too, is a matter within the knowledge of an ordinary juror; indeed, it is routinely explored in cross-examinations in both civil and criminal cases (*i.e.*, "Is your memory today better than it was when you gave your deposition?"). There is no need for expert testimony on this issue and the government's objection is sustained.

#### 2. Post-event information (e.g., lineups, descriptions, later views may contaminate memory of original event; "unconscious transference")

Dr. Fulero asserts that an eyewitness's opinion can be influenced by later views of the accused, or other post-event experiences that might have affected his/her memory. Expert testimony must be relevant to the facts of the case, however, and the government argues that this aspect of Dr. Fulero's testimony is not relevant because there is no evidence that any of the witnesses had any post-event experiences that could have influenced them. (Government Motion at 32-33.) The court is uncertain of the nature of the post-incident events that might be at issue, and therefore reserves ruling on this issue. If Defendant can identify post-incident events or information that might have resulted in "unconscious transference," the court would admit Dr. Folero's testimony on this issue. The ruling on this issue is therefore reserved.

#### 3. Knowledge of the identity of the suspect by the person conducting

**identification procedure**

Recent literature describes the importance of having an investigator who does not know the identity of the suspect conduct the line-up or photo array. Ordinary jurors may well be unaware that the "double-blind" technique can eliminate a potential improper influence on an eyewitness's testimony. Dr. Fulero's testimony on this issue would be helpful to the jury in assessing the significance of the identification testimony. The government's objection is overruled. Again, however, this ruling does not open the door to testimony concerning Mr. Ciccola's purported biases or motivations.

**4.     Conformity effects (multiple witnesses and/or communication)**

Dr. Fulero has described "conformity effects" that occur when multiple witnesses purport to see the same perpetrator or communicate their observations to one another. In this case, however, the court is unaware of evidence that any of the witnesses spoke with each other or that any witness told the others whom they had identified as the offender. Because expert witnesses' testimony must be relevant to the facts of the case, the "conformity effects" testimony could be confusing or misleading and will be excluded.

**5.     Suggestivity/bias (one picture/person standing out or different is more likely to be picked regardless of accuracy)**

Where the accused person stands out or is different from others in the photo array, he.or she is more likely to be identified by eyewitnesses. Although this is not a complicated or counterintuitive notion, the court agrees with Defendant that, if the photo array was in fact flawed in this respect, Mr. Fulero's testimony on the issue could be useful to the jury. The court will reserve ruling, however, pending a showing that Defendant was indeed the only person in the display who matched the description or stood out for some other reason from others within the display.

**6.     Sequential vs. simultaneous presentation**

The parties differ about the value of a sequential display of photos or images as compared with a simultaneous presentation of photos. Simultaneous presentations were standard for many years until studies, including some on which Dr. Fulero relies, suggested they create a greater risk of false positive identifications. The government objects to Mr. Fulero's testimony on this score on the basis, in part, that Defendant has not argued that the photo array was unduly suggestive. Even without making that specific argument or moving to suppress the identifications, however, Defendant can argue that risks inherent in the display methodology, and its potential influence on the witnesses' testimony, should be understood by the jurors.

The government also notes that in some circumstances, a sequential presentation of suspects can actually increase the number of false positive identifications. Those circumstances include cross-racial identification and instances in which the suspect had changed his appearance, both of which are relevant in this case. (Government's Motion at 34-35.) The government also notes recent studies that raise questions concerning the superiority of the sequential presentation method. These factors, and other research findings, are appropriate material for cross-examination, but do not satisfy the court that Dr. Fulero's testimony concerning this issue should be excluded. The government's objection is overruled.

**7. Instructions given to witnesses (specific instruction that perpetrator "may or may not" be in lineup reduces false alarms/misidentifications)**

Mr. Fulero counsels in favor of instructions to the witnesses that the perpetrator "may or may not" be in the photo array. In this case, the government asserts, the investigator did give such instructions to the witnesses. Mr. Fulero's testimony on this score would therefore be misleading. The government's objection is sustained.

> **8. Effect of post-identification feedback (telling witnesses that they "got it right"can affect witnesses' memory and confidence)**

Similarly, as there is no evidence that police in this case gave any feedback to the eyewitnesses about whether they "got it right," Mr. Fulero's testimony that such statements are improper would be unnecessary and potentially misleading. It will be excluded.

**C. Retrieval stage:**

> **1. Unconscious transference (is the in-court identification that of the perpetrator, or the person picked from the identification procedure or seen at some other [earlier] time?)**

For the same reasons described above (see section B.2), the court is unaware that "unconscious transference" took place in this case. Absent a showing of circumstances from which the jury could find that it did, this aspect of Dr. Fulero's testimony will be excluded. For now, the ruling is reserved.

> **2. Confidence of witness (virtually unrelated to accuracy, contrary to lay view)**

Dr. Fulero proposes to testify that the confidence that a witness feels in his/her memory is in fact unrelated to its actual factual accuracy. *See Newsome v. McCabe*, 319 F.3d 301, 305 (7th Cir. 2001), *quoting Krist v. Eli Lilly & Co.*, 897 F.2d 293-96-97 (7th Cir. 1990) ("'The mere fact that we remember something with great confidence is not a powerful warrant for thinking it true.'") The government cites research findings to the contrary (Government's motion, at 27), and objects to Dr. Fulero's position as an improper attack on the credibility of the witnesses, which is traditionally a matter for the jury alone to assess. In light of the fact that the parties' experts appear to have competing views on this question, the court is comfortable in concluding that the testimony can be admitted without risk that the jury will be misled. That confidence may be unrelated to accuracy is not a matter that is obvious to every juror and could be helpful to the jurors in this case. The government's objection is overruled.

## II. Double-blind Procedure and Prior Experience with Defendant

In addition to the testimony concerning problems with acquisition, retention, and retrieval of memory, Mr. Fulero will offer his opinion that the failure to utilize a double-blind lineup (that is, a lineup conducted by an officer who does not know which person in the display is the suspect) increased the risk that the positive identifications of Defendant Banks were mistaken. He will testify, further, that the officer who conducted the photo array in this case had prior experience with Defendant that could have had an improper effect on the eyewitness.

As explained earlier, the court agrees with Defendant that the value of a double-blind procedure is a matter that is appropriately presented to the jury, despite the fact that Defendant's counsel did not move to suppress the photo array as unduly suggestive. Again, however, testimony regarding Officer Ciccola's bias or motivation will be excluded. As to Officer Ciccola's prior experience with Defendant, the court will reserve ruling on this issue pending a hearing, given the possible hearsay problems that the testimony presents, and the fact that it could be more prejudicial than probative.

## III. Sequential vs. Simultaneous Lineup

Dr. Fulero intends to testify that Detective Ciccola's failure to utilize a sequential lineup procedure increased the likelihood of false positive identification. He cites extensive scientific support for the conclusion that simultaneous lineups encourage witnesses to engage in a relative judgment process in ways that a sequential procedure does not. The government has identified research findings that call that conclusion into question and will be able to effectively cross-examine Dr. Fulero. The court concludes, as it did earlier, that this testimony should be admitted.

## **CONCLUSION**

The court will permit Mr. Fulero to present certain aspects of his expert opinions, but sustains the government's objections to other aspects and will conduct a further pre-trial hearing to rule on the remaining objections. Having had the benefit of the parties' very comprehensive

briefs, the court believes such a hearing can be conducted effectively by telephone.

                                              ENTER:

Dated: April 13, 2011                      _____
                                              REBECCA R. PALLMEYER
                                              United States District Judge